**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONFORMIS, INC. AND JOHN MICHAEL SCHAUB,<br><br>               Plaintiffs,<br><br>  v.<br><br>AETNA, INC. and AETNA LIFE INSURANCE COMPANY,<br><br>              Defendants. | Civil Action No. 1:20−CV−10890−IT<br><br>**AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Conformis, Inc. and John Michael Schaub, file this Amended Complaint for Injunctive Relief and Damages and Jury Demand against Defendants, Aetna, Inc. and Aetna Life Insurance Company ("ALIC") (collectively, "Aetna" or "Defendants"), and allege upon personal knowledge as to their own acts and as to events taking place in their presence, and upon information and belief as to all other facts, as follows:

## NATURE OF THIS ACTION

1.      Conformis is a medical device company that designs and manufactures personalized, or customized, knee and hip replacements that are patient-specific, including the Conformis iTotal Knee Replacement System (the "Conformis System").  Conformis designs its knees to fit the patient so the surgeon does not have to modify the patient to fit an off-the-shelf knee.  For over seven years following FDA clearance, under guidelines precluding coverage for "experimental" and/or "investigational" medical treatment, Aetna fully covered the Conformis System for its patients in need of a knee replacement.

2.      By covering the Conformis System for so long, Aetna has admitted that the

Conformis System is a safe and effective option for knee replacement patients and is neither

experimental nor investigational.  However, on September 21, 2018, without warning and for no

apparent reason, Aetna reversed its own long-standing policy of providing coverage for the

Conformis System so that its Policy No. 0660 now excludes coverage for customized total knee

replacements under its health plans and the ones it administers.

3.      Aetna provides healthcare insurance, administration, and/or benefits to

policyholders or plan participants pursuant to a variety of healthcare benefit plans and policies

of insurance, including employer-sponsored benefit plans, government-sponsored benefit plans,

and individual health benefit plans (collectively, "Aetna Plans").  Aetna administers the

employee-sponsored benefit plans covering Plaintiff Schaub.

4.      As shown further below, Aetna has violated its duties under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., and state law.  In

particular, Aetna implemented and has, upon information and belief, universally followed Policy

No. 0660, to deny patients, including Plaintiff Schaub, medically necessary knee replacement

services from Conformis.

5.      Since receiving FDA clearance on February 2, 2011, over 100,000 patients have

received the Conformis System.  The efficacy of the Conformis System is well-established; the

Centers for Medicare and Medicaid Services ("CMS"), along with United HealthCare, Cigna,

Anthem Blue Cross Blue Shield, and other carriers cover the Conformis System.  Thus, Aetna's

sudden decision to reverse its course of seven years and declare the Conformis System

"experimental" or "investigational" is as inexplicable as it is unsupportable.

6.     Aetna's wholesale refusal to provide coverage for the Conformis System, despite holding out hope to patients through its charade of an appeals process, is in clear violation of state and federal law, as well as the Aetna Plans, and has caused Conformis to sustain substantial damages.  If Aetna's conduct is allowed to continue, it threatens irreparable harm to Conformis as well as the patients who depend upon the services Conformis provides.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff Conformis, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 600 Technology Park Drive, Billerica, Massachusetts 01821.

8.     Plaintiff John Michael Schaub is an individual residing at 46 South Holman Way, Golden, Colorado 80401.

9.     Defendant Aetna, Inc. is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 151 Farmington Avenue, RW61, Hartford, Connecticut 06156.

10.     Defendant Aetna Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 151 Farmington Avenue, RW61, Hartford, Connecticut 06156.

11.     This Court has personal jurisdiction over Defendants in this action as Defendants operate, conduct, engage in, do business in, and have committed tortious acts within the Commonwealth of Massachusetts; and Defendants engage in substantial and not isolated activities within Massachusetts.

12.     This Court also has personal jurisdiction over Defendants because, at all times material hereto, Defendants purposefully carried on one or more businesses or business ventures

in this judicial District, operating as licensed health insurers; the requisite nexus exists between the businesses and this action; and Defendants engaged in substantial and not isolated activity within this District.

13.     This Court also has jurisdiction over the subject matter of this action pursuant to (i) 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), as this is a civil action, the claims asserted include ERISA claims and, therefore, this suit arises under the laws of the United States; and (ii) 28 U.S.C. § 1367, as Conformis' non-ERISA state law claims are supplemental to its federal claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the violations alleged herein either occurred here or were directed towards Conformis in this District, and events giving rise to the Complaint occurred in this District.

## BACKGROUND AND RELEVANT FACTS

### A.     The Conformis iTotal Knee Replacement System Versus Off-the-Shelf Knees

16.     The Conformis System is an FDA-cleared and CMS-approved total knee replacement ("TKR") system.

17.     Off-the-shelf ("OTS") knees may allow patients to function and improve their quality of life, but OTS knees are rarely a perfect fit, often cause pain, and never quite feel "right" or "natural."  More often than not, OTS knees only *nearly* fit patients.

18.     Many patients with OTS knee replacements report and/or complain that they can feel the foreign object stuck in their body, often with pain.

19.     The limited sizes and shapes of OTS knees make the patients in whom they are implanted prone to a host of issues.  For example, OTS knee implants often cause a patient's femur (thigh bone) to unnaturally overhang the patient's tibia (shin bone).  Just as little as three millimeters of femoral overhang has been shown to be a significant cause of residual pain in total knee replacements, affecting 40% of men and 68% of women, as one study found.

20.     The Conformis System is different from OTS TKR systems and designed to achieve advantages not possible with OTS knee implants.  Patient anatomy varies in many ways and Conformis provides optimal implant fit and performance through an individualized approach.

21.     Conformis' iFit® technology transforms traditional imaging data into patient-specific implants designed to match each patient's unique anatomy, as well as patient-specific instruments that provide anatomically correct guides to aid in surgery.

22.     More specifically, Conformis uses computed tomographic imagery generated by a CT scan to create an "individualized solution" for patients in four key areas: (1) individualized fit; (2) individualized shape; (3) simplified surgical technique; and (4) improved operating room efficiencies.

23.     Because the Conformis System provides an individualized fit, Conformis patients can avoid the host of issues often suffered by patients with OTS knees.

24.     The Conformis System likewise provides patients with improved tibial coverage, which can help reduce pain caused by rotational errors common with traditional OTS TKR systems.

25.     The Conformis System thus addresses the wide variations in patient anatomy that lead to femoral overhang and undercoverage common to OTS TKR systems.

26.     Conformis shapes its implants to fit each patient so the surgeon need <u>not</u> shape the patient's anatomy to fit the implant as is often the case with an OTS knee implant.  The Conformis System starts with each patient's medial, lateral, and patellofemoral J-curves, corrected for deformity, as the basis for implant design.

27.     Among other things, individualized shape helps avoid soft tissue impingement (*e.g.*, popliteus tendon "popping").  To correct this issue traditionally would require arthroscopic releases.  Individualized shape also provides increased volumetric bone preservation (*e.g.*, less grinding and diminution of bone).  In other words, the Conformis System helps avoid compressing the leg while also maximizing the preservation of the patient's bone.

28.     Conformis uses patient data to create an individualized surgical technique using pre-navigated, disposable, patient-specific instruments for every step, and surgical planning images to provide detailed resection values that can be used to verify accuracy throughout the surgery.

29.     Finally, the Conformis System greatly improves operating room efficiency. Conformis delivers its system in a single, pre-sterilized kit a few days before surgery, requires no implant inventory, and includes pre-sterilized, disposable instruments, and a single reusable instrument tray for easy set up and tear down.

30.     On the front end, although the Conformis System can be more expensive than its OTS counterpart, studies suggest the Conformis System experiences less complications over the lifetime of the knee, making it the more economical choice overall.  *See*, *The Economic Value of*

*Customized versus Off-the-Shelf Knee Implants in Medicare Fee-for Service Beneficiaries*,

O'Connor and Blau; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6485650/.

### B. The FDA Confirms 510(k) Status and Aetna and Others Cover the Conformis System

31.     Section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. ch. 9 § 301, *et seq.*, is a premarket submission made to the United States Food and Drug Administration ("FDA") to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR § 807.92(a)(3)) that is not subject to premarket approval.

32.     Conformis obtained FDA 510(k) clearance for the Conformis System on February 3, 2011.  Without FDA clearance, the Conformis System only would be available under an Investigational Device Exemption or "IDE."

33.     Since receiving FDA clearance, over 100,000 patients have received the Conformis System.

34.     CMS has determined that the Conformis System is a covered benefit under Medicare.

35.     Health insurance payors and administrators United HealthCare, Cigna, Anthem Blue Cross Blue Shield, and other payors and administrators cover the Conformis System under the health benefit plans they insure and/or administer.

36.     The American Associate of Hip and Knee Surgeons ("AAHKS") endorses the Conformis System.  The President of AAHKS, Craig J. Della Valle, MD, wrote Aetna on February 14, 2019 regarding Policy No. 0660, stating:  "AAHKS is concerned about this policy because the custom implants in question are FDA approved, have been in use for many years and have peer-reviewed published studies that should support their continued use."

37.     Indeed, there is no question that the Conformis System has been accepted by doctors as standard treatment.

38.     Thus, the Conformis System is widely accepted in the medical and health insurance industries.  Over 90% of commercial payors cover the Conformis System.

39.      From the time Conformis received FDA 510(k) clearance until September 21, 2018, Aetna covered the Conformis System under its policy on Unicompartmental, Bi-compartmental, and Bi-unicompartmental Knee Arthroplasties, numbered 0660 ("Policy No. 0660").

40.     At no time during the 91½ months from FDA clearance in 2011 until Aetna's change in policy in 2018 did Aetna ever claim the Conformis System to be ineffective, experimental, or investigational.

**C.   Aetna's Policy No. 0660 and its Dubious Experimental and Investigational (E&I) Designation**

41.     Without warning and for no apparent reason, Aetna revised Policy No. 0660 to exclude customized total knee implants on September 21, 2018.

42.     Aetna reversed its own long-standing policy when it revised Policy No. 0660 to declare customized total knee implants as "experimental and investigational because [their] effectiveness has not been established."  Policy No. 0660, dated September 21, 2018, at 5.

43.     Policy No. 0660 references and summarizes a number of studies dated 2016 through 2019.

44.     Notably, Conformis cites many of the same studies in support of its system on its website because these studies support Conformis' implant as a safe, proven, and effective medical device.

45.     Aetna does not explain in Policy No. 0660 why the effectiveness of this FDA-, CMS-, AAHKS-, United-, Cigna-, and Anthem BC/BS-cleared and/or approved product is not established or what more is required to demonstrate such effectiveness.

46.     Notably, Policy No. 0660 appears to have first concluded that customized total knee implants were "experimental and investigational" in its September 21, 2018 Revision, whereas that same Policy had covered them previously for over seven years.

47.     On its website, www.aetna.com, Aetna, Inc. has published a glossary of terms applicable to its health plans.

48.     According to the glossary, "experimental services or procedures…are often newer drugs, treatments or tests.  They are not yet accepted by doctors or by insurance plans as standard treatment.  They may not be proven as effective or safe for most people."

49.     Aetna defines, "investigational services" similarly:  "[a]lso known as experimental services or procedures.  These are often newer drugs, treatments or tests.  They are not yet accepted by doctors or by insurance plans as standard treatment.  They may not be proven as effective or safe for most people."

50.     Aetna does not cover treatments it deems "experimental and investigational" under the health insurance it sells and/or administers unless a number of criteria are met, including the imminent death of the patient.[1]

51.     As is the case today, prior to its September 21, 2018 Revision, Policy No. 0660, Aetna did not cover "experimental and investigational" treatment but Aetna did cover the Conformis System.

---

[1] http://www.aetna.com/members/individuals/health/plan_details/NewYork/experimental.pdf

52.     It is therefore reasonable to conclude that prior to this revision, Aetna did not consider customized total knee replacements, like the Conformis System, to be "experimental and investigational."

53.     Other health insurers covering the Conformis System have definitions of experimental and investigational similar to Aetna and agree that the Conformis System is not "experimental and investigational."

54.     For example, Cigna defines these terms as "usually a new kind of drug, treatment, or test," which because they are unproven, "may not be covered by [a patient's] health plan." Anthem BC/BS defines these terms as "Health care procedures that are still being tested, but not yet proven to treat a condition."

55.     Despite these similarities, Cigna and Anthem cover the Conformis System because they *do not* consider it to be experimental or investigational.  This is because, as alleged in greater detail above and below, the effectiveness of the Conformis System has long been established – a fact Aetna recognized for over seven and one half years until it abruptly changed Policy No. 0660.

56.     Under Aetna's own definitions of "experimental services" and "investigational services," the Conformis System is "accepted by doctors and insurance plans as standard treatment."

57.     Thus, in issuing Policy No. 0660, Aetna makes a number of false representations of material fact about the Conformis System, including, among others:

      a.   The Conformis System has "not be[en] proven as effective or safe for most people";

    b.  the Conformis System is "not yet accepted by doctors or by insurance plans as standard treatment"; and

    c.  the Conformis System's "effectiveness has not been established."

58.    ALIC published these false representations to providers, patients, and prospective patients by denying claims on the basis that the Conformis System is "experimental and investigational."

59.    Upon information and belief, Aetna, Inc. published these representations to providers, patients, prospective patients, and the public at large by publishing these statements on its website.

60.    In short, Aetna has no legitimate basis to exclude coverage for the Conformis System and its Policy No. 0660 contains numerous material false and misleading statements of fact regarding the Conformis System.  Aetna is wrong to deny coverage for the Conformis System.

61.    Upon information and belief, the reason for Aetna's abrupt policy reversal and false statements was that the Conformis System was viewed as being more costly than OTS TKR systems.  Aetna's motive for excluding coverage for the Conformis System after over seven and one half years of coverage was purely financial.

62.    As described in greater detail below, since OTS TKR systems often do not provide the right fit, cause pain and discomfort, and can lead to unnecessary complications, Aetna has acted in total disregard of patient welfare and its obligations to the plans administered by Aetna.

### D.  **The Conformis System is Not Experimental or Investigational**

63.     Contrary to Aetna's false and misleading statements in Policy No. 0660, the effectiveness of the Conformis System is long established.

64.     The Conformis System has been the subject of substantial clinical studies from 2009 through the present (https://www.conformis.com/surgeon-resource-center/clinical-studies).

65.     These studies in no way support Aetna's conclusion that customized, individually made ("CIM") knee implants are not proven effective.  To the contrary, the studies indicate that the CIM knees for many patients are more effective, and in terms of total episode spending, less expensive.

66.     For example, in a study of 224 patients (125 receiving CIM knee implants and 103 receiving OTS knee implants), "the [CIM] group achieved a higher global patient satisfaction…[and] a better basic daily function."  *See Patient satisfaction – A comparison between patient-specific implants and conventional total knee arthroplasty*, Reimann, Brucker, Arbab, and Luring, Journal of Orthopaedics, April 8, 2019.

67.     Another study commented:  "Achieving proper fit and anatomic congruence is one of the main goals in TKA [total knee arthroplasty]; however, using available fixed-geometry implants [*i.e.*, OTS implants] establishes intraoperative challenges because of the widely varying anatomy in the population."  In other words, CIM implants are usually a better fit.  *See What is the Possible Impact of High Variability of Distal Femoral Geometry on TKA?  A CT Data Analysis of 24,042 Knees*, Meier, Zingde, Steinert, Kurtz, Koeck, and Beckmann, Clinical Orthopaedics and Related Research, February 12, 2019).

68.     In a study of 4,434 Medicare fee-for-service beneficiaries receiving knee implants (739 receiving a CIM knee implant and 3,695 receiving an OTS knee implant), "[t]he overall

episode expenditures, which include the preoperative CT scan, index procedure, and 12-month postoperative healthcare spending, were $1695 less for the customized implant cohort ($18,585) than for the off-the-shelf implant cohort ($20,280 [ ])" *See The Economic Value of Customized versus Off-the-Shelf Knee Implants in Medicare Fee-for-Service Beneficiaries*, O'Connor and Blau, American Drug & Benefits, April 2019.

69.     Another study found "CIM implants [are] an attractive option for improving patient outcomes while reducing the total costs associated with TKA."  Simulated study based on current data estimated that "by 2026, an adoption rate of 90% for CIM implants can reduce the number of readmissions and revision surgeries by 62% and 39%, respectively, and can save hospitals and surgeons 6% on procedure time and cut down cumulative healthcare costs by approximately $38 billion." *See The Adoption of New Medical Technologies:  The Case of Customized Individually Made Knee Implants*, by Namin, Jalali, Vahdat, Bedair, O'Connor, Kamarthi, and Isaacs, ScienceDirect, Value in Health (2019).  Troublingly, Aetna appears to ignore the wealth of positive indications set forth in these clinical studies.

70.     As Dr. Della Valle of AAHKS informed Aetna, "the literature cited in support of the 'investigational' characterization (Beal *et al*.) studied only patient specific instrumentation in connection with off the shelf implants and not customized implants.  Most of the literature and the registry data related to this issue does not appear to have been considered."

71.     That Aetna's search for reasons to exclude the Conformis System in the face of overwhelming evidence of its proven effectiveness and wide acceptance is fair neither to Conformis nor to Aetna's subscribers.  And it is directly contrary to Aetna's prior positions and medical policies.

72.     Again, the Conformis System has FDA clearance, CMS covers the Conformis System as a covered benefit under Medicare, and health insurance payors and administrators United HealthCare, Cigna, Anthem Blue Cross Blue Shield, and other payors and administrators cover the Conformis System under the health benefit plans they insure and/or administer.

73.     Notably, the Conformis System has a 5A rating from the Orthopaedic Data Evaluation Panel in the United Kingdom ("ODEP").  The 5A rating is based on strong evidence of implant performance over five years, including low revision rates as indicated in the UK's National Joint Registry (NJR).  ODEP ratings provide a simple, independently verified assessment as to the performance of an implant, assessed against national clinical best practice guidelines.  This enables clinicians to ensure that the implants that they use comply with national guidelines.

74.     There is no question that the Conformis System has been established, proven safe and effective for most people, and accepted by most physicians as standard treatment.

**E.  Conformis Complains and Aetna Doubles Down on Policy No. 0660**

75.     By letter dated April 29, 2019, Conformis asked Aetna to reconsider its revised Policy No. 0660 and go back to its prior policy of covering the Conformis System.

76.     Conformis provided a bibliography containing a number of favorable studies post-dating the studies Aetna previously had considered in concluding the Conformis System was experimental.

77.     In response to Conformis' April 29, 2019 letter, Aetna released its December 4, 2019 Policy No. 0660 Supplement.

78.     Based on the supplement, Aetna considered some of the additional studies suggested by Conformis, but did not change its non-coverage policy.  Instead, it supplemented

the "ConforMIS Knee Implant" section in the background portion of the bulletin following

Policy No. 0660 itself by adding summaries of some of the additional studies Conformis

suggested.  The entries are mostly straight summaries; Aetna was careful to note where the

studies suggest additional research that could be done.

79.     While Aetna cites to studies supporting the excellent results of the Conformis

System, it seems to ignore these results in determining not to cover the Conformis System under

plans it sells and/or administers.

80.     Instead, while ignoring the overall conclusions of various studies, Aetna focuses

on some suggestions within certain studies that at one point or another may require additional

investigation (a standard disclaimer present in medical studies) as proof of the experimental and

investigational nature of the implants.

81.     For example, Aetna summarizes a 2018 study by Levengood and Dupee in part as

follows:  "The authors concluded that this technology restored the neutral coronal mechanical

axis very accurately, while offering unique benefits such as improved implant fit and restoration

of the patient's J-curves, which require further investigation."

82.     So while Aetna relies on studies that firmly establish the safety and efficacy of the

Conformis System, it cherry picks standard language recommending additional research to reach

its dishonest conclusion.

83.     Aetna does not reference the fact that CMS and large commercial payors cover

the Conformis System.

84.     Likewise, Aetna does not explain why the effectiveness of this FDA-, CMS-,

AAHKS-, United-, Cigna-, and Anthem BC/BS-cleared and/or approved product is not

established or what more is required to demonstrate such effectiveness.

85.     By letter dated January 13, 2020, counsel for Conformis demanded Aetna (a) cease and desist its wrongful conduct in treating the Conformis System as experimental and investigational, (b) remove the across-the-board exclusion of CIM knee implant systems and begin authorizing access to the Conformis System in accordance with Aetna's obligations under applicable health plans, Aetna's own guidelines, and applicable law; and (c) retroactively authorize any pending authorizations for Conformis' products and the Conformis System previously denied on the basis of Policy No. 0660.

86.     Conformis further demanded that Aetna certify to Conformis that Aetna has complied with these demands.

87.     By email dated January 14, 2020, the Aetna Executive Response Team acknowledged receipt of the cease and desist letter.

88.     By email dated January 15, 2020, the Aetna Executive Response Team advised that it could take no further action on the letter unless and until it received a letter of legal representation from Conformis.

89.     The same day, Conformis sent a letter of legal representation and Aetna acknowledged receipt of that letter.

90.     Conformis has not received any further response from Aetna to the cease and desist letter.

**F.  Aetna has Caused a Drop in Use of the Conformis System**

91.     Aetna's sudden and inexplicable policy change has caused healthcare providers to prescribe Conformis Systems to their patients less often than previously.

92.     For example, orthopedic surgeons have told members of Conformis' sales force that ordering the Conformis System is more difficult than previously, as it is unclear whether it

will be covered and potentially will cause delays in surgery.  As a result, many have moved away from ordering the Conformis System for both their Aetna and non-Aetna patients to avoid such issues.

93.     Conformis has contracts with more than 2,100 healthcare providers (e.g., hospitals, group purchasing organizations, and integrated delivery networks) under which Conformis supplies the Conformis System.

94.     Likewise, other non-contracted healthcare providers have routinely prescribed or otherwise provided the Conformis System since it received FDA clearance in 2011.

95.     These providers (contracted and non-contracted) treat Aetna subscribers.  And Aetna insures or administers the plans of approximately 22 million American patients, making it the third largest health insurer behind United and Anthem.

96.     As a result of Aetna's September 21, 2018 revision to Policy No. 0660, these providers may no longer purchase, or prescribe or otherwise provide the Conformis System to their Aetna patients.

97.     Moreover, Aetna has led all healthcare providers (contracted and non-contracted) to believe, incorrectly, that the Conformis System is experimental, investigational, and unsafe for their patients.

98.     Upon information and belief, approximately 5,000 Aetna patients received the Conformis System between February 21, 2011 and September 21, 2018.

99.     Since September 21, 2018, Conformis has seen a significant drop-off in Aetna patients who have received the Conformis System.

### G.  **Aetna Wrongfully Denies Coverage to Mr. Schaub**

100.    Plaintiff, John Michael Schaub, is a physical therapist assistant employed by Genesis HCC ("Genesis").

101.    Genesis sponsors an Aetna Choice POS II - Advantage Plan - APCN PLUS health plan (the "Genesis Plan") for which ALIC is the Third Party Administrator ("TPA").

102.    ALIC contracts with eviCore Healthcare ("eviCore") to handle claims under the Genesis Plan, including Mr. Schaub's.

103.    Mr. Schaub is a physically active 60-year-old competitive cyclist who engages in rigorous training.

104.    After a lifetime of activity, Mr. Schaub developed osteoarthritis in his knee.

105.    Mr. Schaub's orthopedic surgeon, Michael P. Wertz, M.D. of Boulder Bone and Joint, diagnosed osteoarthritis and recommended Mr. Schaub have a TKR.

106.    Mr. Schaub researched his options and discussed them with Dr. Wertz and they concluded that the Conformis System was best for him.

107.    As a physical therapist who has rehabilitated hundreds of knee replacement patients, Mr. Schaub has unique insight into the healing process.  Moreover, Mr. Schaub has experience rehabilitating patients with both OTS and Conformis knee replacements.

108.    He has observed, first-hand, patients with the Conformis System heal faster and suffer fewer setbacks than those with OTS knee replacements.  This factored into his decision to select the Conformis System.

109.    Dr. Wertz has performed hundreds of knee replacement surgeries using both OTS and Conformis knee replacements.  He has had extensive experience with the Conformis System

as well and this factored into his recommendation that Mr. Schaub use the Conformis System for his knee replacement.

110.    Conformis requires a CT scan to obtain the necessary information to design and manufacture a CIM knee implant to a patient's unique anatomy.

111.    Because OTS knees are <u>not</u> designed to fit a patient's unique anatomy, patients receiving OTS knee replacements do <u>not</u> require a CT scan.

112.    On December 17, 2019, Dr. Wertz prescribed a CT scan in association with Mr. Schaub's knee replacement.

113.    At all times relevant, ALIC and eviCore were aware that Mr. Schaub's CT scan was specifically prescribed in preparation for Mr. Schaub's Conformis System knee replacement.

114.    On December 18, 2020, ALIC and eviCore authorized Mr. Schaub's CT scan, which he had on December 19, 2019.

115.    Mr. Schaub initially scheduled his knee replacement surgery for February 18, 2020 at Avista Adventist Hospital.

116.    Conformis notified Mr. Schaub on January 17, 2020 that it had received his CT scan.

117.    Conformis notified Mr. Schaub on January 28, 2020 that it was designing his Conformis System.

118.    Mr. Schaub attended his pre-operative appointment at Boulder Bone and Joint on February 5, 2020, at which time Dr. Wertz's staff informed him that all insurance authorizations were complete and his surgery would go forward as scheduled.

119.    Conformis notified Mr. Schaub on February 6, 2020 that Conformis was performing the final inspection on his knee implant.

120.     On February 11, 2020, Mr. Schaub attended a pre-operative and joint replacement class at Avista at which time hospital staff informed him that all of his authorizations were complete.

121.     The next day, on February 12, 2020, the benefits adviser representing Avista contacted Mr. Schaub and again confirmed all authorizations were complete and advised Mr. Schaub regarding his patient cost share.

122.     On February 13, 2020, Conformis notified Mr. Schaub that his Conformis System would be ready and delivered for his Tuesday, February 18, 2020 surgery date.

123.     Upon information and belief, Avista was in contact with ALIC/eviCore throughout this process.  ALIC/eviCore, therefore, had been aware for months that Mr. Schaub had scheduled his medically necessary knee replacement surgery for February 2020 and never gave Mr. Schaub any indication that there was any issue with his choice of knee.

124.     However, on Monday, February 10, 2020, Dr. Wertz was informed that ALIC/eviCore had reversed the authorization for Mr. Schaub's surgery, based solely on his choice of knee implant, and was denying coverage for Mr. Schaub's knee replacement surgery. Dr. Wertz appealed this denial.

125.     On or about February 11, 2020, Dr. Wertz engaged in a peer-to-peer review with a Dr. Ihle of eviCore.  During that call, Dr. Ihle gave Dr. Wertz his opinion that the Conformis System is a very effective knee replacement system and that he had installed upwards of 60 during his career as an orthopedic surgeon.  Nonetheless, Dr. Ihle stated that his hands were tied by Aetna's Policy No. 0660.

126.     On Friday, February 14, 2020, at the very end of the business day preceding his scheduled surgery, Mr. Schaub received three calls from Dr. Wertz's office at 4:35 pm, 4:42 pm,

and 4:50 pm.  The urgency of the call was that Dr. Wertz had just heard from eviCore/Aetna that

they had reversed authorization for Mr. Schaub's surgery (scheduled for the following Tuesday

with Monday being the President's Day holiday) and granted Dr. Wertz a peer-to-peer review

and one additional appeal, both of which eviCore/Aetna denied.

127.    Mr. Schaub immediately called Aetna Member Services and initially spoke to

"Crystal."  She transferred him to a man (name unknown) who informed Mr. Schaub that it was

eviCore that made the decision to pull his authorization.

128.    On February 15, 2020, Mr. Schaub contacted John, Dr. Wertz's assistant at 8:34

am on his personal phone to discuss the situation and what could be done to rectify the situation.

129.    On February 17, 2020, Mr. Schaub called Aetna Member Services 7:00 am and

again at 8:12 am.  He spoke with "Amber" from Aetna and "Jenna" from eviCore.  Jenna stated

the surgery was cancelled because Mr. Schaub chose the Conformis System.  He asked whether

Aetna would agree to reschedule the surgery if he agreed to use a Stryker implant and she

indicated that it would.

130.    During that call, Mr. Schaub informed Jenna of eviCore about Dr. Ihle's

comments and she responded that it was Aetna's policy not to cover the Conformis System.  She

also stated that she was unaware Aetna had covered Conformis knee implants in the past.

Mr. Schaub asked why eviCore authorized a CT scan that was specific to make the Conformis

System, she stated the CT scan was authorized and did not see that it was for a custom knee

implant.

131.    During that call, eviCore informed Mr. Schaub that his surgery was denied on

February 10, 2020 and then again on February 14, 2020.  It was not until March 16, 2020, as set

forth below, that Mr. Schaub first received a direct written communication to inform him of Aetna's preordained denial.

132.     Mr. Schaub again called eviCore on February 17, 2020 and spoke with "Terri W." She appeared surprised eviCore denied the peer-to-peer review.  She then asked "if it was one of those personalized knees."  She then told Mr. Schaub eviCore was under contract by Aetna not to authorize payment for "those knees."  Mr. Schaub asked if his appeal had already been decided before the "peers" conferred and she confirmed that was the case.  Given Policy No. 0660, Mr. Schaub's appeal was futile.

133.     Mr. Schaub has made over a dozen calls to Aetna Member Services; most went unanswered and/or unreturned.

134.     By early March 2020, Mr. Schaub's knee pain had become almost unbearable.

135.     On March 3, 2020, Mr. Schaub attempted to make an urgent, telephonic appeal as is allowed under the Genesis Plan.  He spoke with Cindy at Aetna Member Services.  She tried to connect Mr. Schaub to an appeals agent, but the person refused to talk with him.  When he asked for the full names and emails of Cindy and the appeals agent, she denied both requests.

136.     Cindy took Mr. Schaub's appeal over the phone as instructed by the anonymous appeals agent and informed Mr. Schaub she would submit his appeal.  Due to the urgency of the appeal, Mr. Schaub asked for a response in 36 hours.

137.     Three days, and over 60 hours later, Mr. Schaub received a call back from Aetna on March 6, 2020, informing him that Cindy misinformed him that she could take a telephonic appeal and that he needed to appeal in writing.

138.     On March 10, 2020, Mr. Schaub called Aetna's National Clinical Appeals Unit at 1:01 pm and 1:17 pm.  He was never allowed to speak to a person.

139.    On March 11, 2020, Mr. Schaub again called Aetna's National Clinical Appeals Unit and left a message demanding to speak with a person to answer his questions.  He never heard back.

140.    The same day, Mr. Schaub faxed a written appeals letter and associated paperwork to Aetna.

141.    By letter dated March 16, 2020, Mr. Schaub received his first written denial letter. It appears to be in response to his telephonic appeal attempts and, presumably, his March 11, 2020 written appeal.

142.    Mr. Schaub has made repeated written and telephonic appeals, and has exhausted all avenues of appeal.  Notwithstanding, Aetna's March 16, 2020 missive contained a "Member Complaint and Appeal form."

143.    This is the very same form that Mr. Schaub submitted prior to his surgery, along with an additional 24 pages of documents and a detailed letter on March 11, 2020.

144.    Having exhausted his appeals and reached the point where he could not work or live without significant pain, Mr. Schaub had knee replacement surgery on March 19, 2020, and used the Conformis System.

145.    Despite the limited availability of exercise equipment and manual therapy normally employed in the recovery process for total knee rehabilitation (due to the COVID-19 social distancing guidelines), Mr. Schaub now is recovering ahead of schedule.

146.    Mr. Schaub has exhausted all known Aetna appeals processes.

147.    It is clear that Aetna has adopted Policy No. 0660 and engaged in a pattern or practice of wrongfully denying claims like Mr. Schaub's, such that further exhaustion efforts would be futile.

\*      \*      \*      \*      \*

148.    Aetna's conduct has caused Conformis and Mr. Schaub to incur substantial damages and attorneys' fees and, if allowed to continue, threatens irreparable harm to Conformis as well as the patients it treats, thus necessitating this action.

## CAUSES OF ACTION

### COUNT ONE
**(By Conformis against Defendants)**
**(Claim for Product Disparagement / Trade Libel)**

149.    Conformis incorporates by reference all of the foregoing allegations as if set forth at length herein.

150.    Aetna published false statements and assertions regarding Conformis, Conformis' products, and the Conformis System, among other means, by publication of Policy No. 0660.

151.    Among other statements, Aetna concluded that customized total knee implants, including the Conformis System, are "experimental and investigational because its effectiveness has not been established."

152.    In doing so, and based on its definition of the terms "experimental" and "investigational," Aetna makes a number of false representations of material fact about the Conformis System, including, among others:

   a.   The Conformis System has "not be[en] proven as effective or safe for most people";

   b.   the Conformis System is "not yet accepted by doctors or by insurance plans as standard treatment"; and

   c.   the Conformis System's "effectiveness has not been established."

153.    Aetna published these false representations to providers, patients, and prospective patients by denying claims on the basis that the Conformis System is "experimental and investigational."

154.    Upon information and belief, Aetna published these representations to providers, patients, prospective patients, and the public at large by publishing these statements on its website.

155.    Aetna purports to have relied on more than 110 scholarly articles and studies in drawing its conclusion, but in fact its decision is financially driven.

156.    Aetna's conclusion is false.  Both governmental and private health insurance payors and administrators alike, including CMS, United HealthCare, Cigna, Anthem Blue Cross Blue Shield, and other payors and administrators, cover the Conformis System under the health benefit plans they insure and/or administer which demonstrates the Conformis System is not unsafe, unproven, or ineffective.

157.    In addition, Aetna's conclusion is contrary to the overwhelming amount of literature evaluating customized total knee implants generally, and the Conformis System specifically, and establishing their effectiveness, and is contrary to the conclusion reached by similarly situated providers with access to these same 110-plus scholarly articles and studies.

158.    Aetna published these statements with knowledge of their falsity and/or reckless disregard to their falsity; specifically, statements to the effect that customized total knee implants, in general, and the Conformis System, in particular, are unsafe, unproven, and ineffective.

159.    Aetna published these false statements with the intent to harm or hinder Conformis' business endeavors by preventing physicians from prescribing and patients from

using the Conformis System, as made clear by Aetna's revised conclusion that the Conformis System is "experimental and investigational" after  covering the Conformis System for 91½ months from FDA clearance.

160.    Aetna's statements and assertions played a material role in inducing physicians and customers not to prescribe and use the Conformis System.

161.    Aetna was aware that by publishing Policy No. 0660, and its subsequent revisions, physicians and customers would be less likely to prescribe and patients less likely to use customized total knee implants.  Aetna's statements and assertions were injurious, misleading, and false, and proximately caused damage to Conformis, because they have caused, and will cause, a currently unknown number of physicians and patients and/or prospective physicians and patients nationwide and in the Commonwealth of Massachusetts to not prescribe and use the Conformis System, materially affecting Conformis' business.

162.    For example, Conformis has contracts with more than 2,100 healthcare providers (e.g., hospitals, group purchasing organizations, and integrated delivery networks) under which Conformis supplies the Conformis System.

163.    Likewise, other non-contracted healthcare providers have routinely prescribed or otherwise provided the Conformis System since it received FDA clearance in 2011.

164.    These providers (contracted and non-contracted) treat Aetna subscribers.  And Aetna insures or administers the plans of approximately 22 million American patients, making it the third largest health insurer behind United and Anthem.

165.    As a result of Aetna's September 21, 2018 revision Policy No. 0660, these providers may no longer purchase, or prescribe or otherwise provide the Conformis System to their Aetna patients.

166.     Moreover, Aetna has led healthcare providers (contracted and non-contracted) to believe that the Conformis System is experimental, investigational, and unsafe for their patients.

167.     Conformis is entitled to relief.  As  a  result of Aetna's past and continuing injurious, misleading, and false statements and assertions, Conformis (a) has suffered damages, including a downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; (b) will continue to suffer damages, including due to a continued downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; and (c) will suffer other irreparable damage.

168.     Aetna's acts have caused Conformis damage, irreparably harmed Conformis, and, unless enjoined, will continue to do so in a manner affording Conformis no adequate remedy at law.

169.     Defendants have refused to desist from these wrongful acts and, therefore, Defendants have indicated their intention to continue this unlawful conduct, unless restrained by this Court.

## COUNT TWO
### (By Conformis against Defendants)
### (Tortious Interference with a Contractual Relationship / Business Relationship)

170.     Conformis incorporates by reference all of the foregoing allegations as if set forth at length herein.

171.     At all relevant times, Conformis had established contractual relationships and/or advantageous business relationships with physicians and patients who like and prefer Conformis' products and the Conformis System.

172.     At all relevant times, Aetna was aware of these business relationships and/or advantageous business relationships as proven by the articles Aetna reviewed in preparing Policy

No. 0660, its subsequent revisions, and the claims submitted on behalf of its own subscribers, and Conformis' correspondence.

173.    By way of example, Aetna was aware that Conformis maintained a business relationship with Mr. Schaub as his healthcare provider.  Mr. Schaub desired the Conformis System, his healthcare providers desired to implant the Conformis System, and Conformis desired to sell Mr. Schaub the Conformis System.

174.    By way of further example, Aetna was also aware that Conformis maintained similar business relationships with other similarly situated patients of Doctors Wertz and Lahav who should have, and would have, had the Conformis System prescribed to them but for Aetna's interference.

175.    Aetna has knowingly, wrongfully, maliciously, intentionally, and tortiously interfered with Conformis' contractual relationships and/or advantageous business relationships with physicians and patients by, among other things, misrepresenting to physicians and patients that Conformis' products and the Conformis System are "experimental and investigational," and not covered under Aetna commercial plans.

176.    Aetna's actions have interfered with, impeded, and hindered Conformis' relationships with physicians and patients, and have caused specific harm to Conformis' contractual/business relationships with them.  By way of example, Aetna interfered with Conformis' contractual/business relationship with Mr. Schaub and his medical team, with knowledge that its actions would likely result in Mr. Schaub not using the Conformis System. Aetna has no privilege or justification for its actions and its conduct including, without limitation, Aetna's false representations of material fact about the Conformis System, including, among others:

    a.   The Conformis System has "not be[en] proven as effective or safe for most people";

    b.   the Conformis System is "not yet accepted by doctors or by insurance plans as standard treatment"; and

    c.   the Conformis System's "effectiveness has not been established."

177.   On the contrary, Aetna's motive is improper and driven purely by cost, and in complete disregard for patient health, patient comfort, and product/procedure effectiveness.

178.   Aetna published these false representations to providers, patients, and prospective patients by denying claims on the basis that the Conformis System is "experimental and investigational."

179.   Upon information and belief, Aetna published these representations to providers, patients, prospective patients, and the public at large by publishing these statements on its website.

180.   Aetna's activities, as alleged, constitute tortious interference with a contract/business relation under the laws of the Commonwealth of Massachusetts.

181.   Aetna has refused to desist from these wrongful acts, and therefore has indicated its intent to continue this unlawful conduct, unless restrained by this Court.

182.   Conformis is entitled to relief because Aetna's actions have proximately caused Conformis damage, including a downturn, and continuing downturn, in the number of patients prescribed the Conformis System.

183.   Aetna's actions have irreparably harmed Conformis and its incalculable goodwill in its brand and, unless enjoined, will continue to do so in a manner affording Conformis no adequate remedy at law.

184.    Conformis is entitled to relief.  As  a  result of Aetna's injurious, misleading, and false statements and assertions, Conformis (a) has suffered damages, including a downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; (b) will continue to suffer damages, including due to a continued downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; and (c) will suffer other irreparable damage.

185.    Aetna's acts have caused Conformis damage, irreparably harmed Conformis, and, unless enjoined, will continue to do so in a manner affording Conformis no adequate remedy at law.

186.    Defendants have refused to desist from these wrongful acts, and therefore Defendants have indicated its intention to continue this unlawful conduct, unless restrained by this Court.

## COUNT THREE
### (By Conformis against Defendants)
### (Unfair Trade Practices Act / Unfair Competition Under Mass. Gen. Laws c. 93A)

187.    Conformis incorporates by reference all of the foregoing allegations as if set forth at length herein.

188.    Conformis and Aetna are in the conduct of trade or commerce within the meaning of Mass. Gen. Laws c. 93A.

189.    As more fully described above, Aetna engaged in unfair methods of competition and/or committed unfair and deceptive acts and practices by, among other things, misrepresenting Conformis' products and the Conformis System as experimental and/or investigational in contradiction of its prior position asserting otherwise.

190.    Aetna further engaged in unfair methods of competition and/or committed unfair and deceptive acts and practices by publishing false representations of material fact about the Conformis System, including, among others:

      a.  The Conformis System has "not be[en] proven as effective or safe for most people";

      b.  the Conformis System is "not yet accepted by doctors or by insurance plans as standard treatment"; and

      c.  the Conformis System's "effectiveness has not been established."

191.    Aetna published these false representations to providers, patients, and prospective patients by denying claims on the basis that the Conformis System is "experimental and investigational."

192.    Upon information and belief, Aetna published these representations to providers, patients, prospective patients, and the public at large by publishing these statements on its website.

193.    Aetna's statements and assertions were injurious, misleading, and false, and proximately caused damage to Conformis, because they have caused, and will cause, a currently unknown number of physicians and patients and/or prospective physicians and patients nationwide and in the Commonwealth of Massachusetts to not prescribe and use the Conformis System, materially affecting Conformis' business

194.    Aetna's actions and misrepresentations were willful and knowing and in violation of Mass. Gen. Laws c. 176D, § 3 as recognized pursuant to Mass. Gen. Laws c. 93A.

195.    Aetna's acts and practices occurred primarily and substantially within Massachusetts."

196.     Aetna's acts have caused Conformis damage, irreparably harmed Conformis and, unless enjoined, will continue to do so in a manner affording Conformis no adequate remedy at law.

197.     Defendants have refused to desist from these wrongful acts, and therefore Defendants have indicated its intention to continue this unlawful conduct, unless restrained by this Court.

198.     Conformis is entitled to relief.  As  a  result of Aetna's injurious, misleading, and false statements and assertions, Conformis (a) has suffered damages, including a downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; (b) will continue to suffer damages, including due to a continued downturn in the number of patients prescribed the Conformis System causing the loss of thousands of dollars in sales per patient; and (c) will suffer other irreparable damage.

199.     Aetna's acts have caused Conformis damage, irreparably harmed Conformis, and, unless enjoined, will continue to do so in a manner affording Conformis no adequate remedy at law.

200.     Defendants have refused to desist from these wrongful acts and, therefore, Defendants have indicated their intention to continue this unlawful conduct, unless restrained by this Court.

## COUNT FOUR
### (By Plaintiffs against Defendants)
### (Claim for ERISA Benefits)

201.     Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

202.    Plaintiffs file this action pursuant to ERISA § 502(a)(1)(B), 28 U.S.C. §1132, to recover benefits assigned to it by the participants or subscribers of an ERISA plan.

203.    Conformis has provided its products and the Conformis System to Mr. Schaub.

204.    Mr. Schaub has assigned to Conformis the right to seek reimbursement from Aetna, to "appeal any denial or underpayment of benefits."  Attached hereto at Exhibit A is a true and correct copy of the Assignment of Insurance Benefits/Direct Payment/Authorized Representative/Agent signed by Mr. Schaub.

205.    As assignee of Mr. Schaub to his claims under the Genesis Plan, Conformis is entitled to recover benefits due to Mr. Schaub and enforce the rights of Mr. Schaub under the terms of the Genesis Plan.  In particular, as assignee of the Genesis Plan, Conformis is entitled to reimbursement under the ERISA-governed plans for Conformis' products and the Conformis System provided to Mr. Schaub.

206.    Aetna has buried a purported anti-assignment provision in the boilerplate of the over 125-page Genesis Plan which it did not calculate to be read or understood by Mr. Schaub. The provision is thus invalid.  To the extent that the Genesis Plan prohibited the assignment of benefits to Conformis, Aetna waived any purported anti-assignment provisions, ratified the assignment of benefits to Conformis, and/or is estopped from using any purported anti-assignment provisions against Conformis due to its course of dealing with Conformis.

207.    And to the extent that the Genesis Plan prohibited the assignment of benefits to Conformis, any such purported anti-assignment prohibitions are unenforceable as, among other things, contrary to public policy, as adhesion contracts, and/or due to a lack of privity with Conformis.

208.    To the extent that Mr. Schaub did not or could not validly assign his claims under the Genesis Plan to Conformis, he has standing in his own right to pursue his claims under ERISA.

209.    The Genesis Plan requires reimbursement of medical expenses incurred by Mr. Schaub at usual, customary, and reasonable rates.

210.    Aetna is obligated to pay for medically necessary services, covered services, or covered benefits as defined under its plans including reconstructive surgery and supplies like prosthetic knee devices.

211.    Aetna has breached the terms of the Genesis Plan by refusing to make reimbursements for charges covered by the Genesis Plan, in violation of ERISA 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

212.    As a result of, among other acts, Aetna's numerous procedural and substantive violations of ERISA, any appeals are deemed exhausted or excused, and Conformis and/or Mr. Schaub are entitled to relief.

213.    Moreover, pursuant to 29 U.S.C. § 1132(a)(1)(B), Conformis and/or Mr. Schaub are entitled to recover unpaid benefits from Aetna. Conformis and/or Mr. Schaub also are entitled to declaratory and injunctive relief to enforce the terms of the Genesis Plan and to clarify the right to future benefits under such plans, as well as attorneys' fees.

## COUNT FIVE
### (By Plaintiffs against Defendants)
### (Violation of Fiduciary Duties of Loyalty and Due Care in Violation of ERISA)

214.    Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

215.    29 U.S.C. § 1132(a)(3) states that a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

216.    Aetna is a fiduciary under ERISA under the Genesis Plan as it was issued pursuant to an employee benefit plan and Aetna:

        a.      exercises discretionary authority or discretionary control respecting the management of the Genesis Plan and the disposition of their assets; and

        b.      has discretionary authority in the administration of the Genesis Plan.

217.    As an ERISA fiduciary, Aetna owed the Plaintiffs a duty of care, defined as an obligation to act prudently, with the care, skill, prudence, and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  Further, as a fiduciary, Aetna was required to ensure that it was acting in accordance with the documents and instruments governing the Genesis Plan, and in accordance with ERISA § 404(a)(l)(B) and (D), 29 U.S.C. § 1104(a)(l)(B) and (D).   In failing to act prudently, and in failing to act in accordance with the documents governing the Genesis Plan, Aetna has violated their fiduciary duty of care.

218.    As a fiduciary, Aetna also owed Plaintiffs a duty of loyalty, defined as an obligation to make decisions in the interest of its beneficiaries, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A) and ERISA § 406, 29 U.S.C. § 1106. Thus, Aetna could not make benefit determinations for the purpose of saving Aetna money at  the expense of the Plaintiffs.

219.    Aetna has violated its fiduciary duty of loyalty to Mr. Schaub and Conformis, by assignment, by, among other things, refusing to make reimbursements for the Conformis System, to its own advantage, at the expense of Plaintiffs.  In addition, Aetna violated its fiduciary duty of loyalty by failing to inform Mr. Schaub, and Conformis, as assignee of Mr. Schaub, of material information, by misrepresenting requirements for reimbursement under the Genesis Plan.

220.    Mr. Schaub has assigned his rights under the Genesis Plan to Conformis.

221.    To the extent that Mr. Schaub did not or could not validly assign his claims under the Genesis Plan to Conformis, he has standing in his own right to pursue his claims under ERISA.

222.    As assignee of Mr. Schaub, Conformis is entitled to recover benefits due to him and enforce his rights under the terms of the Genesis Plan and Aetna's fiduciary duty of loyalty under ERISA.

223.    Aetna has violated its fiduciary duty of loyalty to Plaintiffs by, among other things:  refusing to cover Conformis' products including the Conformis System; refusing to allow Conformis any opportunity to negotiate coverage beyond the unduly burdensome terms it has wrongfully required in contravention of applicable law and plan terms; failing to inform Mr. Schaub and Conformis, as assignee of Mr. Schaub, of material information; and publishing false representations about the Conformis System.

224.    Conformis has standing to pursue claims under ERISA as an assignee and authorized representative of Mr. Schaub.

225.   Conformis and/or Mr. Schaub are entitled to relief to remedy Aetna's violation of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief.

**COUNT SIX**
**(By Plaintiffs against Defendants)**
**(Denial of Full and Fair Review in Violation of ERISA § 503)**

226.   Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

227.   As an assignee and authorized representative of Mr. Schaub's claims, Conformis is entitled, as is Mr. Schaub in his own right entitled, to receive protection under ERISA, including (a) a "full and fair review" of all claims denied by Aetna; and (b) compliance by Aetna with applicable claims procedure regulations.

228.   Although Aetna is obligated to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 and applicable regulations, including 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715-2719, Aetna has failed to do so by, among other actions:  refusing to provide the specific reason or reasons for the denial of each of the claims; refusing to provide the specific plan provisions relied upon to support its denial; refusing to provide the specific rule, guideline or protocol relied upon in making the decision to deny claims; refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure; and denying coverage based on a lack of preauthorization when

the Aetna Plans require no such preauthorization as a condition to coverage.  By failing to comply with the ERISA claims procedures regulations, Aetna failed to provide a reasonable claims procedure.

229.    Because Aetna has failed to comply with the substantive and procedural requirements of ERISA, any administrative remedies are deemed exhausted pursuant to 29 C.F.R. § 2560.503-1(l) and 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). Exhaustion is also excused because it would be futile to pursue administrative remedies, as Aetna does not acknowledge any basis for its denials and thus offers no meaningful administrative process for challenging denials.  Finally, exhaustion would be futile since Aetna has adopted a clear policy of excluding coverage for Conformis' products and the Conformis System.

230.    Conformis and/or Mr. Schaub have been harmed by Aetna's failure to provide a full and fair review of appeals submitted under ERISA § 503, 29 U.S.C. § 1133, and by Aetna's failures to disclose information relevant to appeals and to comply with applicable claims procedure regulations.

231.    Conformis and/or Mr. Schaub are entitled to relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy Aetna's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claims procedure regulations.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as follows:

A.    Declaring that Aetna has breached the terms of the Genesis Plan and awarding damages for unpaid benefits, as well as awarding injunctive and declaratory relief to prevent Aetna's continuing actions detailed herein that are unauthorized by the Genesis Plan;

B.    Declaring that Aetna failed to provide a "full and fair review" under § 503 of ERISA, 29 U.S.C. § 1133, and applicable claims procedure regulations, and that "deemed exhaustion" under such regulations is in effect as a result of Aetna's actions, as well as awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA and its claims procedure regulations;

C.    Declaring that Aetna violated its fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1106, and awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA;

D.    Temporarily and permanently enjoining Aetna from continuing to pursue its actions detailed herein, and ordering Aetna to pay benefits in accordance with the terms of the Genesis Plan and applicable law;

E.    Awarding lost profits, contractual damages, and compensatory damages in such amounts as the proofs at trial shall show;

F.    Awarding exemplary damages for Aetna's intentional and tortious conduct in such amounts as the proofs at trial will show;

G.    Declaring that Aetna has violated the terms of the Genesis Plan and/or policies of insurance covering Mr. Schaub;

H.    Requiring Aetna to make full payment on all previously denied charges relating to Mr. Schaub;

I.    Requiring Aetna to pay Conformis the benefit amounts as required under the Genesis Plan;

J.    Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including Section 502(g) of ERISA, 29 U.S.C. § 1132(g);

K.      Awarding multiple damages and reasonable attorneys' fees and costs for violation

of and as required by Massachusetts General Laws c. 93A and c.176D;

L.      Awarding costs of suit;

M.      Awarding pre-judgment and post-judgment interest as provided by common

law, federal or state statute or rule, or equity; and

N.      Awarding all other relief to which Plaintiffs are entitled.

### JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated:  August 13, 2020                    Respectfully submitted,

**K&L GATES LLP**

*/s/Adam R.D. Paine*
Jeffrey S. King, BBO 559000
Adam R.D. Paine, BBO 697246
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
(617) 261-3100
(617) 261-3175/Fax
jeffrey.king@klgates.com
adam.paine@klgates.com

*Pro Hac Vice Pending*
Anthony P. La Rocco (N.J. Atty. No. 023491982)
Robert F. Pawlowski (N.J. Atty. No. 036741999)
One Newark Center, Tenth Floor
Newark, NJ 07102
(973) 848-4000
(973) 848-4001/Fax
anthony.larocco@klgates.com
robert.pawlowski@klgates.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on August 13, 2020, and a copy thereof was served in its entirety on all counsel of record by the Court's CM/ECF system.

*/s/ Adam R.D. Paine*
Adam R.D. Paine
